**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **JAMES R. BURNELL,** ***individually and on behalf of all others similarly situated,*** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No.** |
| **MAZDA MOTOR CORPORATION** | ) | |
| **Defendant.** | ) | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, James R. Burnell ("Plaintiff" or "Mr. Burnell"), individually and on behalf of all others similarly situated, by counsel, and moves for judgment against the Defendant Mazda Motor Corporation ("Mazda" or "Defendant") and states as follows:

**NATURE OF THE ACTION**

1. This is a putative class action brought on behalf of Virginia consumers who purchased or leased certain Mazda CX-90 vehicles that suffer from premature and excessive deterioration of braking system components, accompanied by persistent, abnormal, and intrusive brake squealing (the "Brake Defect"), and the Lane-keep Assist system's inappropriate and overly "corrective" steering in opposition to steering input from the driver (the "Lane-keep Defect") (collectively, the "Defects").

2. As set out in detail in the factual allegations below, Plaintiff purchased a new 2024 Mazda CX-90 in Virginia for personal, family, and household use. Shortly after purchase, he began to experience loud, distracting brake squealing and strong, inappropriate steering "corrections"

from the vehicle's Lane-keep Assist feature. Mazda's authorized dealers (agents) repeatedly assured Plaintiff that these conditions were "normal," performed temporary or ineffective repairs, and ultimately deemed the brakes "unfixable." Plaintiff's experience is typical of a broader problem with Mazda CX-90 vehicles.

3. Mazda designed, manufactured, marketed, and sold model year 2024–2026 Mazda CX-90 vehicles equipped with braking components and Lane-keep Assist systems that are prone to premature and excessive deterioration, noisy operation, and unsafe steering behavior. The Defects causes Class Vehicles to exhibit loud, high-pitched brake squealing and Lane-keep Assist overcorrections that distract drivers, undermine confidence in the vehicle's safety systems, diminish the vehicles' value, and create safety risks when drivers are forced to disable the Lane-keep Assist feature or drive with distracting brake noise.

4. Defendant knew or should have known of the Defects long before Plaintiff's purchase, including through pre-release testing, engineering analyses, warranty data, internal communications with its dealers, consumer complaints, and other sources of information available only to Mazda. Despite this knowledge, Mazda concealed and failed to disclose the Defect to Plaintiff and Class Members at the time of sale or lease and during subsequent warranty service and repairs.

5. Through uniform marketing, sales materials, and dealer communications, Mazda represented that its CX-90 vehicles, including those purchased or leased by Plaintiff and the proposed Class, were safe, reliable, and suitable for their intended use, while omitting material facts concerning the Defect and its safety and economic consequences.

6. Plaintiff seeks to represent a class of Virginia consumers ("Class Members") who purchased or leased affected Mazda CX-90 vehicles in Virginia (the "Class Vehicles") and who

were injured by Mazda's deceptive and fraudulent conduct. Plaintiff asserts claims under the Virginia Consumer Protection Act ("VCPA"), Va. Code §§ 59.1-196 et seq., and for common-law fraud, on behalf of himself and the proposed Class.

**PARTIES**

7. Mr. Burnell is a natural person and a resident of Virginia. At all relevant times, Mr. Burnell purchased and used his Mazda CX-90 for personal, family, and household purposes.

8. Mazda is a Japanese multinational company that produces automobiles and engines. It owns 100% of Mazda Motor of America, Inc. ("Mazda America").[1] Mazda "engages primarily in manufacturing and sales of vehicles and their parts and other related business."[2] Mazda furnishes products and services to Mazda America for distribution to customers throughout the United States.[3] Mazda controls and appoints the officers of Mazda America.[4] For the fiscal year ending March 31, 2025, Mazda America's net sales in the United States comprised over 43.4% of the overall net sales for Mazda and its "71 consolidated subsidiaries [] and 20 affiliates."[5] Mazda established Mazda America for operations in the United States in February 1971.[6] In March 2018, Mazda "and Toyota jointly established Mazda Toyota Manufacturing, U.S.A., Inc. in the U.S."[7] In January 2022, "Mazda Toyota Manufacturing, U.S.A., Inc. began manufacturing mass production vehicles."[8]

---

1 Mazda, *Annual Securities Report*, at 6 (June 24, 2025), available at https://www.mazda.com/content/dam/mazda/corporate/mazda-com/en/pdf/investors/library/s-report/2025/f_repo250627.pdf (last accessed on Nov. 20, 2025).
2 *Id*. at 5.
3 *Id*. at 5–6.
4 *Id*. at 6.
5 *Id*. at 2, 5, 9
6 *Id*. at 4.
7 *Id*.
8 *Id*.

9. Throughout the *Annual Securities Report* referenced in this Complaint, Mazda refers to the "Group," i.e., the Mazda Group which it describes as "consisting of Mazda Motor Corporation ("Mazda" or the "Company"), 71 consolidated subsidiaries, and 20 affiliates accounted for using the equity method (as of March 31, 2025)."[9]

**JURISDICTION AND VENUE**

10. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The proposed Class consists of at least 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Mazda.

11. Plaintiff is a citizen of Virginia. Mazda is a citizen or subject of Japan. Minimal diversity exists under 28 U.S.C. § 1332(d)(2).

12. The Court may exercise personal jurisdiction Mazda based on the jurisdictional allegations below and throughout this Complaint, including in the **PARTIES** section above. The Court has specific jurisdiction over Mazda pursuant to Virginia's long-arm statute (Va. Code § 8.01-328.1) based on its forum-related activities from which this action arises, and the forum-related activities of its primary domestic subsidiary, Mazda America, which Mazda substantially controls.

13. Mazda distributes and sells Mazda vehicles to consumers and businesses through at least sixteen (16) authorized dealerships (agents) in Virginia.

14. Mazda designs, manufactures, markets, distributes, and sells the Class Vehicles under its registered trademark "Mazda." In fact, Mazda applied for trademark registration for "MAZDA CX-90"—the very vehicle at issue in this action—with the United States Patent and

---

[9] *Id*. at 5.

Trademark Office ("USPTO"), which maintains its headquarters in Alexandria, Virginia. Mazda, in fact, applied for and secured scores of trademark registrations generally and as to the Class Vehicles via submissions to the USPTO at its headquarters. From Spring 2023 to the present (and even before then), when Class Vehicles were sold and marketed to Class Members, Mazda purposefully availed itself of the United States' legal protections by registering and maintaining registration with the United States' government for the trademark associated with its vehicles and parts, which Mazda uses to identify and distinguish its vehicle and parts in the United States, including in this District and Division.

15. Mazda purposely availed itself of markets in the United States selling approximately half a million vehicles per year in this market through its domestic subsidiary, Mazda America. Indeed, Mazda has purposefully availed itself of the protection of various statutes of the United States by filing lawsuits in the United States District Courts for the Northern District of Georgia, Eastern District of Michigan, Southern District of New York, and Western District of New York.

16. Mazda is a global automobile manufacturer who purposely availed itself of the automobile and automobile-related products' markets in Virginia by extensively promoting, warranting, selling, leasing, and servicing, directly and indirectly, vehicles (including the Class Vehicles) and related automobile products in Virginia. Those Class Vehicles were defective and otherwise violated Virginia laws (as alleged herein) resulting in significant damages to Class Members in Virginia.

17. Mazda promotes, on its website directed to American consumers and business partners, Mazda America as one of its "Major Facilities Overseas."[10] It maintains this website, www.mazda.com, from servers it owns or controls in Japan. Mazda also promotes all vehicles sold by Mazda America in the United States and directs American consumers and business partners to the website it maintains from Japan.[11]

18. As Mazda's *Annual Securities Report* states, "[i]n the United States, sales were driven by *our* Large products and the introduction of a hybrid model of the CX-50, and sales reached a record-high of 435 thousand units, a 15.9% increase year on year."[12] Class Vehicles manufactured in Japan are specifically segregated from other Mazda vehicles intended for sale in other countries, and Mazda placed certification labels on the Class Vehicles that assured compliance with U.S. federal safety requirements[13], and ensured those Class Vehicles were shipped to the United States with full knowledge that Mazda America would then distribute them across the United States, including in Virginia.

19. These Class Vehicles were directly targeted to the United States market, including Virginia. Mazda certified that the vehicles complied with United States safety requirements and ensured that they shipped directly to a wholly owned subsidiary responsible for distribution in the United States.

---

[10] Mazda, *Major Facilities*, available at https://www.mazda.com/en/about/facilities/#north (last accessed on Nov. 20, 2025).

[11] Mazda, *Vehicles*, available at https://newsroom.mazda.com/en/cars/ (last accessed on Nov. 20, 2025).

[12] Mazda, *Annual Securities Report*, at 29 (June 24, 2025).

[13] Mazda affixed Motor Vehicle Safety Standard Labels and Vehicle Emissions Control Information Labels on all Class Vehicles sold in the United States. Mazda, *2024 Mazda CX-90 Digital Owner's Manual*, available at https://www.mazdausa.com/static/manuals/2024/cx-90/contents/70060700.html (last accessed on Nov. 20, 2025).

20. Mazda continuously communicates with the United States National Highway Traffic Safety Administration (NHTSA) to allow for distribution and sale of its vehicles, including the Class Vehicles, in the United States. For example, on November 22, 2022, Daisuke Hirata, Manager of Mazda's Asia, Pacific and Central & South American Certification Group Environmental and Safety Engineering Department, sent correspondence to NHTSA in Washington, D.C. to provide "VIN code information for the 2024 model year CX-90" as required by "§565.16 in CFR Part 565." Mr. Hirata identified that the correspondence originated from 3-1 Shinchi, Fuchu-cho, Aki-gun, Hiroshima 730-8670 Japan." The enclosure he provided identified the origin plants for the vehicles as "MAZDA; Hiroshima, Japan" and "Mazda; Hofu, Yamaguchi, Japan." Mr. Hirata sent corresponding letters to NHTSA for other 2024 Mazda models like the CX-5, CX-30, and Mazda 3. Numerous other Mazda employees, based in Japan, routinely send substantially similar letters to NHTSA in Washington, D.C. to facilitate distribution and sale of Mazda vehicles throughout the United States.

21. As required by 49 U.S.C. § 30164 (and predecessor versions of that statute), Mazda has, for many years, designated an agent "on whom service of notices and process in administrative and judicial proceedings may be made . . . in writing" and "filed" that designation "with the Secretary of Transportation."

22. Mazda affixed federal safety certification labels to the Class Vehicles manufactured in Japan and directly approved the same labels for Class Vehicles manufactured in the United States, in each case knowing that they would be sold in the United States. The certification labels represented that the Class Vehicles conformed to U.S. safety standards, thereby enabling the vehicles to be sold in all 50 states.

23. Mazda freely acknowledges that its "[b]usinesses in North America are managed by Mazda Motor of America, Inc. and the Company."[14] In other words, Mazda directly manages business activities in the United States. Mazda played a key role in Mazda America's analysis and decision making relating to the Class Vehicles sold in the United States, including Virginia.

24. The Class Vehicles' Warranty Booklets identify Mazda Motor Corporation on the cover page and include the following statement:

> We thank you very much for choosing Mazda. We at Mazda design and build vehicles with complete customer satisfaction in mind. From the moment you get behind the wheel of your new Mazda, you'll notice how good it feels. A feeling you'll appreciate for as long as you own your Mazda.
>
> You'll also be pleased to know how strongly we stand behind every Mazda Vehicle. The New Vehicle Limited Warranty and the Powertrain Limited Warranty described in this booklet is one of the finest available.
>
> . . . .
>
> **Mazda Motor Corporation**
> **and**
> **Mazda North American Operations**

25. The Class Vehicles Owner's Manual identifies Mazda Motor Corporation on the cover page and includes the following statement:

> Thank you for choosing a Mazda product. We at Mazda design and build vehicles with complete customer satisfaction in mind.
> . . . .
>
> Regular servicing of your vehicle by an expert technician helps maintain both its roadworthiness and its resale value. A world-wide network of Authorized Mazda Dealer can help you with their professional servicing expertise.
>
> Their specially trained personnel are best qualified to service your Mazda vehicle properly and precisely to original specifications. Also, they are supported by a wide range of highly specialized tools and equipment specially developed for servicing Mazda vehicles. When maintenance or service is necessary, consult an Authorized Mazda Dealer.

---

[14] *Id*. at 125.

> We assure you that all of us at Mazda have an ongoing interest in your motoring pleasure and in your full satisfaction with your Mazda product.
>
> **Mazda Motor Corporation**
> **HIROSHIMA, JAPAN**

26. Mazda and Mazda America jointly and collaboratively monitored customer complaints and warranty claims relating to the Defects, their unsuccessful attempts to remedy the Defects, the issuance of Service Alerts to dealers, and implementation of safety recalls, described below.

27. Mazda exercises control over Mazda America through several formal and informal mechanisms.

28. Mazda purposely availed itself of the United States market, including Virginia, and actively takes steps to enable Mazda America's distribution and sale of Mazda's vehicles in the United States. Mazda conducts all testing and evaluation necessary to apply for and obtain Certificates of Conformity from the United States Environmental Protection Agency ("EPA") and submits the applications and supporting documents for such certificates. As with its communications with NHTSA described above, Mazda prepares and submits applications and supporting documents to the EPA, along with related communications, through its employees in Hiroshima, Japan. Mazda has followed this same process and approach in its interactions with the EPA for many years.

29. Mazda and Mazda America share common executives. For example, Tom Donnelly is Managing Executive Officer of Mazda and President and CEO of Mazda America.[15] Jeffrey H.

[15] Mazda, *Executive Profiles—Tom Donnelly*, available at https://newsroom.mazda.com/en/about/executive/10803/index.html (last accessed on Nov. 20, 2025).

Guyton is currently the Representative Director, Senior Managing Executive Officer and CFO at MMC.[16] He previously simultaneously held the roles of Senior Managing Executive Officer and President and CEO of Mazda America.[17] Takuji Iwashita is currently Managing Executive Officer and Assistant to the Officer overseeing Operations in North America and Executive Vice President of Mazda America.[18]

30. Mazda "has established a system for unified management of all items of quality information" to detect and solve market problems.[19] "Such information is gathered from distributors and dealerships in Japan and overseas and by employing the results of surveys by external institutions and conducting the Company's own market research. Through the system, the collected information is shared Companywide in real time."[20] "By using the system and closely monitoring daily progress, the Company investigates quality-related incidents and their causes, determines and implements improvement measures, and confirms the results."[21] "The Company also carries out quality improvements capitalizing on the vehicle information collected through the utilization of connectivity technologies in addition to conventional initiatives based on customer input."[22]

---

[16] Mazda, *Executive Profiles—Jeffrey H. Guyton*, available at https://newsroom.mazda.com/en/about/executive/1556/index.html (last accessed on Nov. 20, 2025).
[17] *Id.*
[18] Mazda, *Executive Profiles—Takuji Iwashita*, available at https://newsroom.mazda.com/en/about/executive/10240/index.html (last accessed on Nov. 20, 2025).
[18] *Id.*
[19] Mazda, *Mazda Sustainability Report 2024*, at 83 available at https://www.mazda.com/content/dam/mazda/corporate/mazda-com/en/pdf/sustainability/report/2024e_all.pdf (last accessed on Nov. 20, 2025)
[20] *Id.*
[21] *Id.*
[22] *Id.*

31. Mazda also employs "award systems for sharing and honoring best practices demonstrated by the staff of dealerships and distributors that have contributed to increased customer satisfaction through excellent teamwork and the sales and service staff members who achieved outstanding results."[23] Additionally, "[a]t Mazda dealership and distributors around the world, systems have been established to gather opinions and requests from customers, to respond to them honestly, accurately, and quickly, and to reflect this input in sales and services in cooperation with the Mazda Head Office."[24]

32. Mazda controls the public name and brand of Mazda America. In consumer transactions, like those with Plaintiff and other Class Members, Mazda's brand and logo serve as its corporate and subsidiaries' official seal and signature to consumers.

33. Mazda purposefully avails itself of the markets of the United States and individual states, as Florida's District Court of Appeal—Third Circuit noted in 2023,

> Mazda Japan contends that these types of actions may have been taken by its American subsidiary but were not taken by Mazda Japan. Applying these criteria, however, we are persuaded that the record in this case supports a reasonable inference that Mazda Japan itself has purposefully availed itself of the markets of the U.S. and Florida. Mazda Japan—not its American subsidiary—developed lines of vehicles, including the subject vehicle, for the U.S. market. Mazda Japan—not its American subsidiary—designed those vehicles to comply with U.S. regulations. Mazda Japan—not its American subsidiary—registered and owns the U.S. trademarks under which these vehicles are marketed and sold in the U.S. and Florida. Mazda Japan—not its American subsidiary—in its annual reports, states its goals for sales in the U.S. Mazda Japan—not its American subsidiary—announced its plans to improve the Mazda sales force, Mazda franchises, and Mazda marketing strategy "adapted to the characteristics of the US market," which, it announced was "crucial for Mazda [Japan]." Mazda Japan, in an ongoing relationship with its customers, ordered multiple recalls from Japan.
>
> In these matters, Mazda Japan made clear that Florida—the third largest State in the U.S. and presumably the third largest car market—was specifically being targeted. Mazda Japan admitted that its vehicles are "intended for the United States

[23] *Id.* at 84.
[24] *Id.*

> market, including Florida." It also backed up these words with direct contacts with Florida. It shipped hundreds of vehicles to Florida. From Japan it ordered recalls, expressly naming and including Florida, which is evidence of Mazda Japan's efforts to foster an ongoing relationship with the owners of its cars in Florida. It promoted its new design concepts at an event in Florida.
>
> If not Florida, what market were these actions of Mazda Japan intended to reach? Put another way, if not to serve the State's market, what was the purpose of Mazda Japan designing vehicles for, shipping vehicles to, and continuing to provide technical support in the form of recalls for its vehicles owned in Florida? Whatever other markets Mazda Japan was targeting, these circumstances support a reasonable inference that Mazda Japan targeted its vehicles toward Florida, which is all the Plaintiff must show to overcome a motion to dismiss.
>
> While these facts alone are sufficient to support a reasonable inference that Mazda Japan is targeting the U.S. and Florida market, there is an additional fact that does so. As mentioned above, one of the factors the U.S. Supreme Court identified as "additional conduct" indicating a foreign defendant's "intent or purpose to serve the market in the forum State" justifying specific jurisdiction is "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."

*Mazda Motor Corp. v. Triche*, 365 So. 3d 403, 411–412 (Fla. Dist. Ct. App. 2023) (quoting *Asahi Metal Indus. Co. v. Superior Court of California, Solano City*, 480 U.S. 102, 112 (1987).

34. Venue is proper in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division, including Plaintiff's purchase and use of his Vehicle and his repeated attempts to obtain repairs from Mazda's authorized dealers located in this District.

## FACTUAL ALLEGATIONS

### <u>Mazda Touts the Quality, Reliability, and Safety of Its Vehicle</u>

35. Mazda designed, tested, manufactured, distributed, marketed, sold, and leased the Class Vehicles in Virginia.

36. Defendant uses its network of authorized dealerships in Virginia to market, sell, and lease Mazda vehicles in Virginia, including the Class Vehicles.

37. Mazda states that it is committed to safety— "making safer cars is about more than

just protecting the people riding in them. Our vision is for a world with no road accidents, where all road users are safe, and drivers' lives are enriched by the freedom and joy that driving provides."[25] Mazda also tracks and displays safety performance evaluations for Mazda in each market, including the United States.[26]

38. Mazda primarily competes for car sales in the United States with other large automakers such as Honda, Nissan, and Kia.[27]

39. In the fiscal year ending March 31, 2025, Mazda sold 435,000 vehicles in the United States, inclusive of the Class Vehicles.

40. The Mazda CX-90 is a full-size crossover SUV. When Mazda introduced the CX-90, it marketed the vehicle as Mazda's "new flagship vehicle with wider, longer, and more aggressive proportions that perfectly blend its high performance appearance with world-class refinement."[28] The CX-90 is specifically marketed to families, with Mazda stating that the "CX-90 can accommodate families and friends in all three rows. Cabin space, cargo capacity, safety features, and many amenities are optimized for their needs."[29]

41. Mazda has sold over 100,000 CX-90 vehicles (Model Years 2024–2026) in the United States, including thousands in Virginia.

42. Mazda makes assurances to customers of care, durability, quality, and safety. Consistent with its marketing and public statements, Mazda falsely represents its vehicles as safe

[25] Mazda, *Safety*, available at https://www.mazda.com/en/innovation/monozukuri/technology/safety/ (last accessed on Nov. 20, 2025).
[26] *Id.*
[27] U.S. News & World Report, *Mazda*, available at https://cars.usnews.com/cars-trucks/mazda (last accessed on Nov. 20, 2025).
[28] Mazda America, *2024 CX-90*, available at https://news.mazdausa.com/vehicles-2024-cx-90#assets_34137_167-119:123265 (last accessed on Nov. 20, 2025).
[29] *Id.*

and dependable, dedicating an entire page on its website to "safety."[30] Therein, Mazda emphasizes that it "has always been unwavering in its commitment to safety."[31] Mazda also states that, in earning "IIHS *TOP SAFETY PICK+* awards" its vehicles, including the CX-90 "must perform under exceptional pressure. From intense crash tests to navigating collision avoidance, each model must show strength in every structure."[32]

43. Mazda specifically touts the safety of the CX-90 in its marketing materials, including its braking performance and Lane-keep Assist system. For example, a press release announcing the CX-90 MY 2024 posted on MNAO's website states: "As with all Mazda vehicles, safety is a priority for the CX-90 for both the driver and all occupants. Standard i-Activsense safety features include Smart City Brake Support, Blind Spot Monitoring, Mazda Radar Cruise Control with Stop & Go, Driver Attention Alert, Lane Keep Assist with Lane Departure Warning, and Rear Cross Traffic Alert."[33] Likewise, Mazda's press release announcing the pricing and packaging for the 2024 Model Year CX-90 mentioned the word "safety" a dozen times—acknowledging the materiality of safety performance to consumers.[34] Specifically, Mazda emphasized, "[a]s with all Mazda vehicles, safety is a priority for the CX-90 for both the driver and all occupants."[35]

44. Notwithstanding the presence of the Defects in Class Vehicles, which can impact braking performance and inappropriately and overly "correct" steering input from the driver, leading to increased risk of accidents, Mazda emphasizes "SAFETY—MAXIMIZE YOUR

---

[30] Mazda America, *Safety*, available at https://www.mazdausa.com/discover?category=safety (last accessed on Nov. 20, 2025).
[31] Mazda America, *Leading the Way in Safety*, available at https://www.mazdausa.com/discover/leading-the-way-in-safety (last accessed on Nov. 20, 2025).
[32] *Id.*
[33] Mazda America, *2024 CX-90*, available at https://news.mazdausa.com/vehicles-2024-cx-90#assets_34137_167-119:123265 (last accessed on Nov. 20, 2025).
[34] *Id.*
[35] *Id.*

POTENTIAL FOR PEACE OF MIND AND THE FREEDOM TO FOCUS"[36] and MNAO represents that "SAFETY ISN'T JUST A FEATURE—IT'S OUR COMMITMENT TO YOU."[37]

45. Mazda has repeatedly and extensively highlighted safety and security in marketing all model years (2024–2026) of the CX-90.

**<u>The Class Vehicles Are Defective</u>**

46. Notwithstanding Mazda's purported and repeatedly proclaimed commitment to consumer safety, the Class Vehicles suffer from the Defects described above, both of which present life-threatening safety issues.

47. Plaintiff's experience, as detailed below, evinces the severity of the Defects.

**The Nature of the Brake Defect**

48. It is self-evident that a vehicle must have a functional and reliable braking system to ensure consumer safety. The Brake Defect manifests in premature and excessive deterioration of the Class Vehicles' braking system components, including the semi-metallic brake pads, decreased braking performance, loud, high-pitched squealing, creaking, or squeaking noises, and juddering or vibration when the brakes are applied during normal operation. The Brake Defect necessitates frequent replacement or repair of the vehicle's brake system components, including the brake pads, calipers, and rotors.

49. According to Mazda dealerships, brake pads should last 30,000 to 65,000 miles.[38]

---

[36] Mazda, *Safety*, available at https://www.mazda.com/en/innovation/monozukuri/technology/safety/ (last accessed on Nov. 20, 2025).

[37] Mazda America, *Leading the Way in Safety*, available at https://www.mazdausa.com/discover/leading-the-way-in-safety (last accessed on Nov. 20, 2025).

[38] Rochester Mazda, *How Often Should You Replace Your Mazda's Brake Pads?*, available at https://www.rochestermazda.com/blogs/2755/how-often-should-you-replace-your-mazdas-brake-pads/ (last accessed on Nov. 20, 2025).

But drivers of CX-90s complain of brake issues leading to pad replacements within the first thousand miles of their vehicles' operation.

50. While replacement of the braking system components, such as brake pads, rotors, and calipers, may address the creaking, squealing, or squeaking noise temporarily, because the replaced components do not remedy the root cause of the Brake Defect, the replaced parts will quickly deteriorate again after applying the brakes during ordinary and intended use, thereby causing the creaking, squealing, or squeaking noise to return, in addition to juddering and/or vibration and decreased braking performance.

51. The same Brake Defect is inherent and causes unsafe conditions and safety risks for consumers, including Plaintiff and Class Members.

52. Worn brake pads have severe consequences for the performance and safety of the Class Vehicles. Deteriorated brake pads suffer from decreased brake efficiency, pedal vibration, increased noise, and cause wear on other brake components, such as rotors and calipers. As rotors deteriorate, they lose their ability to generate friction with the brake pads, resulting in longer stopping distances and reduced control. The same is true for calipers which, when deteriorated, can reduce brake efficiency, increase stopping distances, and cause excessive pad wear. As a result, the Brake Defect decreases Class Vehicles' overall braking performance which increases risk of accidents for consumers. Because the Defect causes the premature deterioration of braking system components, Class Vehicles are subject to brake performance issues tens of thousands of miles earlier than expected, including within the vehicle's first 1,000 miles.

53. The Brake Defect also manifests in a loud, high-pitched creaking, squealing, or squeaking noise emitted frequently, yet intermittently, by the Class Vehicles, and brake juddering and/or vibration when the brakes are applied. Brake judder makes handling your vehicle more

difficult and can pose a danger to yourself and others. Moreover, due to the startling and distracting nature of the high-pitched squeaking noise, the Brake Defect causes drivers to adjust their braking to minimize the volume and duration of the loud, high-pitched squeaking. Whether this includes braking harder and shorter, or avoiding braking wherever possible, or some other method, it interferes with the regular, expected, and safe operation of the Class Vehicles, increasing the risk to all putative class members and their passengers, as well as motorists and pedestrians in the Vehicles' vicinity. This heightens the risk created by the excessive wear of the braking system components that affect the Class Vehicles' braking performance.

54. Further, the Brake Defect is dangerous because it causes Class Vehicle drivers to disregard sounds and symptoms which are typically affiliated with deteriorating and ineffective brakes. Thus, if Plaintiff and Class Members accept what they are told by Mazda and Mazda's agent dealerships when they present the Brake Defect—that it is "normal" for brakes to squeak and squeal loudly—they are deprived of the typical warning signs related to deteriorating brakes, namely squealing, grinding, and erratic function.

**The Nature of the Lane-keep Defect**

55. The Lane-keep Assist feature "is a system to help the driver stay within the vehicle lane if the vehicle might be deviating. If your vehicle may be deviating from the vehicle lane, the LAS provides steering assistance to avoid departure from the lane."[39]

56. As Mazda states,

> When the LAS operates
> When all the following conditions are met, the LAS operates to assist the steering wheel operation.
> - The vehicle speed is about 64 km/h (40 mph) or faster.
> - The system detects white (yellow) lane lines.

[39] Mazda, *2024 Mazda CX-90 Digital Owner's Manual*, available at https://www.mazdausa.com/static/manuals/2024/cx-90/contents/65480300.html (last accessed on Nov. 20, 2025).

- The CTS steering assist function is not operating.
- The system determines that the vehicle may depart from the lane.

While the steering wheel operation assist is operating, the screen display notifies the driver.[40]

57. The Lane-keep Assist feature relies on the Forward Sending Camera ("FSC") in the CX-90. The FSC "determines the conditions ahead of the vehicle and detects the white (yellow) lines on the traffic lane."[41]

58. The Lane-keep Defect manifests in forceful application of automated torque against the steering input from the driver.

59. This is patently dangerous because it leaves the driver fighting against automated steering in the wrong direction and increases the likelihood of an erratic steering movement by the driver if the inappropriate automated torque ceases.

**Mazda Knew That the Class Vehicles Suffered From the Defects Prior to Its Sale of the Class Vehicles**

60. Mazda had knowledge of the existence of the Defects and the risk they posed to Class Vehicle owners and lessees through its pre-sale durability testing and part sales, consumer complaints, and warranty and post-warranty claims.

**Mazda Conducts Extensive Pre-Sale Testing of the Class Vehicles, Putting Mazda on Notice of the Defects**

61. Mazda is experienced in the design and manufacture of consumer vehicles, including Class Vehicles. As an experienced manufacturer, Mazda conducts tests, including pre-sale functionality, durability, and safety testing, including on the vehicle's brakes and Lane-keep Assist system, to verify that the vehicles it sells are free from defects and align with Mazda's

---

[40] *Id.*

[41] *2024 Mazda CX-90 Digital Owner's Manual*, available at https://www.mazdausa.com/static/manuals/2024/cx-90/contents/65310100.html (last accessed on Nov. 20, 2025).

specifications and intended use of the Class Vehicles, including routine braking and operation with the Lane-keep Assist system enabled.

62. Mazda touts the extent of its pre-sale testing to identify safety and performance issues. These tests include wind tunnel testing, climate testing, crash testing, electromagnetic wave testing, and noise vibration and harshness testing.

63. Mazda subjects its vehicles, including the Class Vehicles, to tens of thousands of miles of road testing before releasing them to the public. This road testing includes assessment of the functionality, performance, and durability of vehicle brake and Lane-keep Assist systems. Mazda also employs computer-aided testing to assess the functionality, performance, and durability of vehicle brake and Lane-keep Assist systems. Mazda employs various comprehensive pre-production quality control techniques to evaluate and assess its vehicles.

64. Thus, through a variety of efforts designed to identify failures in vehicle brake and Lane-keep assist systems, Mazda knew or should have known of the Defects in the Class Vehicles, prior to the time of sale or lease of Class Vehicles to Plaintiff and other Class Members.

65. If Mazda did not discover the Brake Defect in the Class Vehicles, its research and testing were insufficient to support Mazda's advertising, promotion, marketing, warranting, and selling of the Class Vehicles as suitable and safe for operation and use in the intended and reasonably foreseeable manner.

**Mazda Learns of the Defects Through Consumer Complaints and Field Reports Prior to the Introduction of the CX-90 in the United States**

66. Mazda introduced CX-90, or a substantially identical vehicle with a different name, in Japan and Europe prior to its introduction in the United States in 2023. As early as late-2022, Mazda received consumer complaints and field reports regarding what it described as "sudden increase in steering effort on MY2024 CX-90" from Japan and Sweden. Mazda began

investigating the cause of these complaints and field reports shortly thereafter and continued to receive complaints and field reports throughout 2023. As noted above, Mazda issued a safety recall purporting to resolve this issue in CX-90s sold and leased in the United States. However, this safety recall in no way affected the operation of the Lane-keep Assist system in Class Vehicles. As shown by Plaintiff's experience, unsurprisingly, the Lane-keep Assist system continued to malfunction after completion of the safety recall procedure promulgated by Mazda. Mazda knew of the malfunctions in the Lane-keep Assist system prior to distribution and sale of the Class Vehicles in the United States but failed to identify and remediate the underlying cause. Instead, Mazda promulgated an inexpensive safety recall procedure which purported to resolve the underlying issue but failed to do so, as reflected in Plaintiff's experience.

67. On or about January 11, 2023, prior to Mazda's press release announcing the debut of the CX-90 in the United States, Mazda issued Service Alert No.: SA-003/23 ("SA-003/23") with the "**Subject: BRAKE NOISE, JUDDER AND DRAGGING DIAGNOSIS AND SERVICING**." The "**DESCRIPTION"** in SA-003/23 states: "Some vehicles exhibit brake related concerns such as brake noise, brake judder or brake dragging. If you encounter a customer complaint for any one of these symptoms, refer to the following information to understand why symptoms may occur, and to better assist the customer in resolving their specific brake concern." It further notes that it supersedes two previously issued Service Alerts, SA-078/22, issued on December 20, 2022, and SA-019/20, issued on January 20, 2020. All three Service Alerts covered multiple years and models of Mazda vehicles. On information and belief, these Service Alerts resulted from the same design and engineering issues causing the Brake Defect in the Class Vehicles.

**Consumer Complaints from the United States Also Put Mazda on Notice of the Defects**

68. Mazda gathers information from its dealerships and distributors in real-time, monitors this information on a daily, if not, hourly basis, and investigates quality and safety issues and their causes.

69. Consumers submitted complaints regarding the Defects to Mazda authorized dealers and posted them on public forums almost immediately after the introduction of the CX-90 in the United States. Mazda learned of these complaints prior to Plaintiff's purchase of the Vehicle. Consumers have continued to complain about the Defects on public forums and directly to Mazda authorized dealers and Mazda America.

70. When consumers presented their vehicles to Mazda authorized dealers for repairs necessitated by manifestation of the Defects, the authorized dealers promptly forwarded substantive information regarding the requested service and underlying issue to Mazda pursuant to agreements requiring them to do so to be reimbursed for warranty service and repairs.

**Mazda Has Acknowledged To Its Dealerships Issues with the Brakes and Lane-keep Assist Systems in the Class Vehicles**

71. As noted above, many of Mazda's vehicles suffer from "brake noise, judder and dragging" and have for years prior to the introduction of the CX-90 in the United States.

72. Similarly, Mazda's awareness of the CX-90's tendency to forcefully apply automatic steering torque against the input from the driver existed well before consumers in the United States began purchasing CX-90s.

73. Mazda's first acknowledgement of brake issues in the Class Vehicles came on March 8, 2024, when Mazda issued Service Alert No. SA-016/24 ("SA-016/24"), titled: "Brake Noise, Judder and Dragging Diagnosis and Servicing." This is the same title used for the prior Service Alerts for non-Class Vehicles issued by Mazda in 2020, 2022, and 2023. In fact, SA-016/24 superseded those previously issued Service Alerts. It included the CX-90 in the list of

affected vehicles and contained the same "description" reflected in SA-003/23.

74. Mazda's repair procedures in the Service Alert for the Brake Defect in the CX-90, as well as the repair procedures in the prior Service Alerts, fail to remedy the Brake Defect and, as shown by Plaintiff's experience, are temporary band-aids, at best, that Mazda employs to run out the clock on its warranties. The repairs and replacement components called for in SA-016/24 simply do not remedy the root cause of the Brake Defect, resulting in continued excessive and premature deterioration of brake system components, whether replaced or not, and ongoing creaking, squealing, and squeaking noises to return. Mazda America has claimed that Mazda plans to initiate a voluntary customer satisfaction program to address the Brake Defect.

75. As for the Lane-keep Assist system, Mazda issued Service Alert No. SA-027/25, titled "**CX-70 AND CX-90 SERVICE CAUTIONS FOR NEW AND REVISED FEATURES.**" SA-027/25 supersedes two previous Service Alerts which were issued on twelve different dates, apparently based on revisions issued by Mazda. The "**DESCRIPTION**" for SA-027/25 states: "The CX-70 and CX-90 have new and revised features that are different from previous models and may be difficult to understand. This Service Alert provides valuable information to support potential dealer and customer concerns." SA-027/25 provides information about the Lane-keep Assist system, mainly a regurgitation of information in the owner's manuals for the Class Vehicles. Apparently, Mazda seeks to rebuff customer complaints about the Lane-keep Defect by directing its dealers to either provide information from the owner's manuals to complaining consumers or direct the complaining consumers to review their owner's manuals.

76. Mazda has long been aware of the Lane-keep Defect, yet it refuses to take any actual corrective measures.

78. Mazda issued a safety recall on January 18, 2024, for a "sudden and unexpected

change in steering effort." Mazda America, *Statement on Safety Recall 6524A*, available at https://news.mazdausa.com/2024-01-19-STATEMENT-ON-SAFETY-RECALL-6524A (last accessed on Nov. 20, 2025). This safety recall in no way remediates the Lane-keep Defect.

79. Unbeknownst to consumers and the National Highway Traffic Safety Administration ("NHTSA"), Safety Recall 6524A failed to actually remediate the "sudden and unexpected change in steering effort" underlying the recall.

80. The NHTSA filing for Safety Recall 6524A noted the following:

> Descriptive Information: The following is the affected number of vehicles by MY/Make/Model: MY2024 Mazda CX-90 built at Mazda Motor Corporation in Japan: 43,752 units. – Recall population determined by the production record of vehicles equipped with the subject steering gear assembly at Mazda Motor Corporation. – Vehicles not included in the recall have the improved steering gear assembly.
>
> Production Dates: DEC 27, 2022 - DEC 11, 2023
> . . . .
>
> Description of the Defect: While driving, the customer may feel a sudden increase of effort when steering the vehicle.
>
> Description of the Safety Risk: Sudden and unexpected change of steering effort while driving may increase risk of a crash.
>
> Description of the Cause: A worm gear is incorporated in the steering gear assembly, which transmits the power assist generated by the power steering motor. The worm gear friction force may be excessive which results in increased force required to turn the steering wheel. Identification of Any Warning that can Occur: None.

Part 573 Safety Recall Report—24V-022 (Jan. 18, 2024), available at https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V022-8691.PDF (last accessed on Feb. 19, 2026).

81. On January 26, 2026, NHTSA's Office of Defects Investigation (ODI) opened Recall Query 26002 ("RQ26002"). ODI opened RQ26002 to investigate whether Safety Recall 6524A was actually effective, as owners have continued to report dangerous steering issues after

their vehicles were supposedly "repaired." ODI Resume— RQ26002. ODI received "26 complaints and several Early Warning Reporting (EWR) Field Reports alleging intermittent and brief increases in steering effort (described as "sticky steering") during the drive cycle in model year (MY) 2024 CX-90 vehicles manufactured by Mazda North American Operations (Mazda) subject to Recall 24V2022." *Id.* As to "each complaint, the vehicle had the recall remedy completed prior to the reported incident." *Id.*

82. Mazda is aware that this "safety recall" was ineffective, yet it has chosen to do nothing because implementing an honest and effective recall would negatively impact its "bottom line."

**Mazda Monitors Repairs and Services Under Warranty**

83. Mazda receives, parses, and evaluates repairs and services performed under the warranties it issues for its vehicles.

84. Mazda's customer relations department, which interacts with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of the Brake Defect and premature, excessive wear of brake-related parts in the Class Vehicles, including from Plaintiff. Likewise, Mazda's customer relations department, has received numerous reports of the Lane-keep Defect in the Class Vehicles, including from Plaintiff. The customer relations department also collects and analyzes field data, including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

85. Mazda's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its

vehicles.

86. Mazda dictates that when a repair made under warranty (or warranty coverage is requested), dealer service centers must provide Mazda with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Mazda later determines to audit the dealership or otherwise verify the warranty repair.

87. Dealer service centers meticulously provide detailed information about in-warranty service and repairs to Mazda because Mazda will not pay these service centers for the repair if the complaint, cause, and correction are not sufficiently described.

88. Mazda knew or should have known about the Brake Defect and risk of premature wear to brake pads and other brake-related parts. It is reasonable to infer that such replacement parts were ordered from Mazda. All of Mazda's dealer service centers are required to order replacement parts, including brake pads and rotors, directly from Mazda. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Mazda.

89. Mazda routinely monitors part sales reports and is responsible for shipping parts requested by dealerships and technicians. Thus, Mazda has detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of brake pads and rotors, and other brake-related parts, necessary to fix damage caused by the Brake Defect in the Class Vehicles was known to Mazda and should have alerted it to the scope and severity of the Brake Defect.

**<u>Plaintiff's Experience</u>**

90. On November 26, 2023, Plaintiff purchased a new 2024 Mazda CX-90 (the "Vehicle"), VIN JM3KKEHC8R1116012, from Cavalier Automotive, LLC ("Cavalier Mazda"),

an authorized Mazda dealership located in Virginia Beach, Virginia. The Vehicle was purchased for Plaintiff's personal, family, and household use.

91. Plaintiff had previously purchased a "new", "dealership driven" Mazda CX-90 from Cavalier Mazda, which Plaintiff returned the following day because that vehicle's steering lane departure safety feature, Lane-keep Assist, stayed engaged inappropriately. When Plaintiff returned this previous vehicle, the manager at Cavalier Mazda said he had noted the issue prior to selling that vehicle to Plaintiff. Plaintiff had not been alerted to the problem.

92. Plaintiff returned that previous vehicle and subsequently purchased the Vehicle that is the subject of this Complaint.

93. Prior to his purchases from Cavalier Mazda, Plaintiff was shopping for a safe and reliable vehicle for general use as his personal vehicle.

94. A fundamental and essential consideration in obtaining the Vehicle was that it would operate safely with a functional and non-intrusive braking system. Similarly, Plaintiff fundamentally and essentially considered that any driver assistance features, like Lane-keep Assist, in a prospective vehicle would operate safely and functionally.

95. Shortly after purchase, Plaintiff began to experience several problems with the Vehicle.

96. At the time of Plaintiff's purchase of the Vehicle, Mazda knew of the Defects, but neither Mazda nor the sales representative at Cavalier Mazda, disclosed the Defects to Plaintiff when advertising or discussing the features, components, and performance of the Vehicle prior to its sale. Further, Mazda failed to correct its uniform and false representations, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians, touting the safety and reliability of

Mazda vehicles generally and the CX-90 specifically. In reliance on these material omissions, including failures to correct prior false representations, Plaintiff purchased and operated the Vehicle on the belief that the Vehicle would operate properly as warranted. Had Plaintiff been informed of the Defects prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

97. Neither Mazda nor any of its agents, including Cavalier Mazda, informed Plaintiff of the Defects prior to his purchase of the Vehicle.

98. On February 6, 2024, Plaintiff took the Vehicle to Cavalier Mazda for repairs due to forceful and erroneous "correction" caused by the Lane-keep Assist system and squealing brakes. Cavalier Mazda diagnosed the Vehicle as "normal" regarding both issues.

99. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist system following the February 2024 service visit.

100. On April 18, 2024, Plaintiff again took the Vehicle to Cavalier Mazda for repairs due to continuing malfunctioning of the Lane-keep Assist feature and squealing brakes. Cavalier Mazda performed purported repairs on the Vehicle for the complaints Plaintiff made about the erroneous steering "correction" caused by the malfunctioning Lane-keep Assist feature.[42] Cavalier Mazda again diagnosed the brakes as "normal" and told Plaintiff that the Lane-keep Assist sensors were "normal."

101. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist system following the April 2024 service visit.

---

[42] As discussed above, Mazda issued a safety recall on January 18, 2024, for a "sudden and unexpected change in steering effort." Mazda America, *Statement on Safety Recall 6524A*, available at https://news.mazdausa.com/2024-01-19-STATEMENT-ON-SAFETY-RECALL-6524A (last accessed on Nov. 20, 2025). This "safety recall" in no way remediates the Lane-keep Defect.

102. On May 3, 2024, Plaintiff again took the Vehicle to Cavalier Mazda for repairs due to squealing brakes and Lane-keep Assist system problems. The service manager at Cavalier Mazda diagnosed both the brakes and the Lane-keep Assist system as "normal."

103. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist system following the May 2024 service visit.

104. In June of 2024, Plaintiff again took the Vehicle to Cavalier Mazda for repairs due to squealing brakes, the Lane-keep Assist still engaging inappropriately, and two recalls—"VCM Programming" and "Warning Light & CEL with DTC." The Cavalier Mazda technician working on the Vehicle that day acknowledged hearing the brakes squeal when bringing the Vehicle into the service department. Cavalier Mazda performed the two recalls and diagnosed the brakes and Lane-keep Assist system as "normal."

105. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist sensors following the June 2024 service visit.

106. On July 19, 2024, Plaintiff again took the Vehicle to Cavalier Mazda for repairs due to squealing brakes and the Lane-keep Assist still functioning inappropriately. Cavalier Mazda diagnosed the Lane-keep Assist as "normal." Cavalier Mazda scuffed the brake rotors and pads. Plaintiff noted that, upon picking the Vehicle up from the dealership, the brakes started squealing at the first stoplight.

107. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist sensors following the July 19, 2024 service visit.

108. On July 25, 2024, Plaintiff took the Vehicle to a different dealership, Hall Mazda in Virginia Beach, Virginia. Hall Mazda informed Plaintiff that they were unable to duplicate Plaintiff's concerns.

109. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist sensors following the July 25, 2024 service visit.

110. In or around August of 2024, Plaintiff again took the Vehicle to Cavalier Mazda for repairs due to squealing brakes. Cavalier Mazda told Plaintiff that they consulted with the Mazda corporate office for guidance and subsequently applied an anti-squeal compound to the brake pads.

111. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist system following service visit in or around August of 2024.

112. In August or September of 2024, Plaintiff contacted the President of Cavalier Mazda regarding the ongoing issues.

113. In September of 2024, Plaintiff took the Vehicle to Cavalier Mazda due to the brakes still squealing. Upon information and belief, the Cavalier Mazda technician replaced the brake system after receiving permission from a Mazda employee at one of Mazda's corporate offices.

114. On October 10, 2024, Plaintiff was driving the Vehicle during an out-of-state trip and the brakes began squealing again.

115. In October or November of 2024, Plaintiff took the Vehicle to Cavalier Mazda for repairs due to the squealing brakes.

116. Plaintiff continued to experience problems with the Vehicle's brakes and Lane-keep Assist system following service visit in October or November of 2024.

117. Upon information and belief, Cavalier Mazda has deemed the Vehicle's brakes "unfixable."

118. Since Plaintiff purchased the Vehicle, it spent approximately 36 days at a Mazda dealership for repairs.

119. Since purchasing the Vehicle, Plaintiff has encountered persistent squealing from the brakes, which is loud and distracting. This issue has been present from the time of purchase and has remained unresolved despite multiple service visits. The loud, distracting brake noise has impacted Plaintiff's overall driving experience, diminished his enjoyment and use of the Vehicle and caused him continued frustration.

120. In addition, the Vehicle's Lane-keep Assist function still "corrects" the driver inappropriately, which is a serious safety hazard. After Cavalier Mazda repeatedly failed to fix the dangerous overcorrection issue with the Vehicle's "Lane-keep Assist" function, Plaintiff disabled the feature due to safety reasons. This issue further undermines the Vehicle's reliability and detracts from Plaintiff's confidence in its performance.

121. Plaintiff returned the Vehicle to Cavalier Mazda numerous times. Each time, Cavalier Mazda either failed to address the problems, or only applied temporary "fixes."

122. Plaintiff made reasonable efforts to allow Cavalier Mazda, Mazda's authorized dealership and agent, to resolve these defects. Despite these efforts, the problems with the brakes and "Lane-keep Assist" persisted and were left unrepaired. Plaintiff was left relying on and paying for a Vehicle that does not meet his expectations for safety, reliability, or functionality.

123. Plaintiff's repeated attempts to work with Cavalier Mazda were met with limited or temporary solutions, resulting in ongoing safety concerns and inconvenience due to repeated service visits and time spent without the Vehicle.

124. On or around January 30, 2025, Plaintiff sent a letter to Mazda North American Operations via USPS first class certified mail, return receipt requested. In his January 2025 letter,

Plaintiff detailed the problem with the Vehicle's brakes and informed Mazda North American Operations that Cavalier Mazda had deemed the problem with the brakes "unfixable."

125. As of the date of filing of Plaintiff's original Complaint against Mazda America in *Burnell v. Mazda Motor of America, Inc.*—Civil Action No. 2:25-cv-426 (E.D. Va.) ("*Burnell v. Mazda America*"), Plaintiff had not received any response from Mazda to his January 2025 letter. Following litigation in *Burnell v. Mazda America*, Mazda America stipulated to a repurchase of the Vehicle, which was effectuated thereafter.

126. As an authorized dealership for Mazda, Cavalier Mazda, like all of Defendant's authorized dealerships in Virginia, is Defendant's agent:

A. Mazda, through Mazda America, enters into franchise agreements with authorized dealerships as mandated by Virginia law. *See* Va. Code § 46.2-1566 (requiring the Commissioner of the Department of Motor Vehicles to receive copies of any documents affecting dealer franchise agreements and refrain from offering such documents to dealers until receiving approval from the Commissioner). Mazda's franchise agreements with its authorized dealerships outline the terms and conditions under which the dealerships can sell and service Mazda vehicles. The agreements repeatedly emphasize the dealership's role in taking actions on behalf of Mazda, and the importance of dealership compliance with innumerable policies and procedures promulgated by Mazda.

B. Mazda's dealerships are authorized to represent the Mazda brand and are granted the right to use Mazda's trademarks and logos. This association creates a clear link between the dealership and Mazda, reinforcing the agency relationship.

C. Mazda establishes training programs and sets standards for dealership

employees, including sales representatives. This involvement ensures that dealership staff are knowledgeable about Mazda's products and adhere to the company's quality and service standards.

D. Mazda continuously provides advertising materials and guidelines to its dealerships, influencing the way Defendant's vehicles are promoted and creating a cohesive brand image. This level of control further supports the agency relationship. Mazda sets guidelines for warranty service and repairs, and dealerships are required to follow these guidelines. Mazda controls the execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and demands that warranty repairs be performed in strict accordance with its repair guidelines, and Special Service Programs ("SSPs"). Mazda promulgates a lengthy manual for dealers to follow in performing warranty repairs and service, which it regularly updates. This manual provides granular details to dealers regarding warranty services and reimbursement. This level of control over the warranty service and repair process demonstrates the agency relationship between Mazda and its dealerships. But the manual excerpted above is only the tip of the iceberg for the control and direction Mazda exerts over dealerships' warranty service and repairs. Mazda provides a continual stream of guidance and directives to its dealerships through other publications, online communications, and direct contact between dealership employees and Mazda departments and operations.

E. Mazda remains in continuous communication with its authorized dealerships on nearly every issue conceivable pertaining to advertising, sales, and marketing; warranty repairs and service; brand representation; training and standards;

and new and used vehicles.

127. As noted above, Mazda and Mazda America work as an integrated unit with respects to sales and service completed by authorized dealerships (agents) in the United States, including in Virginia. Mazda exerts control over the authorized dealerships in Virginia, directly and indirectly, through its control over Mazda America.

## CLASS ACTION ALLEGATIONS

128. Plaintiff brings this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

129. Plaintiff seeks to represent the following Class:

> All persons residing in the Commonwealth of Virginia who, within the applicable limitations period, purchased or leased in Virginia a model year 2024–2026 Mazda CX-90 for personal, family, or household use.

130. Excluded from the Class are: Mazda and Mazda America's officers, directors, and employees; Mazda and Mazda America's legal representatives, successors, and assigns; any Judge to whom this case is assigned and the Judge's immediate family; and any person who timely and validly requests exclusion from the Class.

131. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

132. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Mazda has sold or leased thousands of Mazda CX-90 vehicles in Virginia during the relevant period. The precise number and identity of Class Members are uniquely within Mazda's possession, custody, and control.

133. **Commonality.** Common questions of law and fact exist as to Plaintiff and all Class Members and predominate over any questions affecting only individual members. Common issues include, without limitation: (a) whether the Class Vehicles suffer from the Defects described herein; (b) whether Mazda knew or should have known of the Defects and, if so, when Mazda obtained such knowledge; (c) whether Mazda failed to disclose the Defects and its consequences to consumers prior to sale or lease; (d) whether Mazda's omissions and representations concerning the Class Vehicles were materially misleading to reasonable consumers; (e) whether Mazda's conduct violated the VCPA; (f) whether Mazda's conduct constituted fraud under Virginia law; and (g) the appropriate measure of damages, restitution, and other relief for Plaintiff and the Class.

134. **Typicality.** Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff, like all Class Members, purchased a Mazda CX-90 in Virginia, used it for personal, family, and household purposes, experienced or is at risk of experiencing the Defects, and was subjected to Mazda's uniform course of conduct and misrepresentations and omissions.

135. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are antagonistic to or in conflict with the interests of the Class. Plaintiff has retained counsel experienced in complex consumer protection and automotive defect litigation, including class actions, who are fully able and prepared to prosecute this action on behalf of Plaintiff and the Class.

136. **Predominance.** Questions of law and fact common to the Class predominate over any questions affecting only individual members. The common issues identified above are capable of class-wide resolution and can be resolved for all Class Members in a single adjudication without the need to consider individualized evidence on liability.

137. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Mazda. It would be impracticable for Class Members to seek redress individually. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort, expense, or the risk of inconsistent adjudications.

**COUNT I**
**FRAUD IN THE INDUCEMENT BY AFFIRMATIVE MISREPRESENTATION AND OMISSION**
*On Behalf of Plaintiff and the Class*

138. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

139. Mazda, directly and through its authorized dealers, made numerous material representations to Plaintiff and Class Members regarding the quality, safety, reliability, and performance of the Class Vehicles, including, but not limited to, representations that the vehicles were safe, dependable, and free from material defects in their braking systems and Lane-keep Assist features.

140. Mazda's marketing materials, owner's manuals, websites, window stickers, and dealer communications uniformly emphasized the safety and reliability of the CX-90 and its advanced driver-assistance features, while omitting material information concerning the Defects and its safety and economic consequences.

141. At the time these representations were made and at the time Plaintiff and Class Members purchased or leased their Class Vehicles, Mazda knew, or was recklessly indifferent to the fact, that the Class Vehicles suffered from the Defects and that the vehicles would exhibit

premature braking system deterioration, brake squealing, and Lane-keep Assist malfunctioning and related issues.

142. Mazda had exclusive or superior knowledge of material facts concerning the Defects, including through pre-production testing, engineering analyses, field data, warranty claims and internal communications, and complaints from consumers and dealers regarding brake system component deterioration, excessive brake noise, and Lane-keep Assist problems. Despite this knowledge, Mazda failed to disclose the Defect to Plaintiff and Class Members before and at the time of sale and during subsequent warranty service and repairs.

143. Mazda further concealed the Defect by instructing its dealers to mischaracterize brake noise and Lane-keep Assist issues as "normal" or as conditions that did not affect safety or vehicle value, and by performing temporary or ineffectual repairs while avoiding a complete and permanent fix.

144. Mazda's omissions and misrepresentations were material. A reasonable consumer would consider it important in deciding whether to purchase or lease a CX-90, and how much to pay for it, to know that the vehicle's braking system and Lane-keep Assist feature are prone to recurring problems that Mazda has been unable or unwilling to fix, and that the brakes may squeal loudly and the Lane-keep Assist may overcorrect and create safety risks. At all relevant times, Mazda knew of the materiality of such omissions, as evidenced by its pre-production testing, consumer warranty and complaint monitoring, and extensive advertising and marketing touting the safety and reliability of its vehicles.

145. Mazda had a duty to disclose the true performance of Class Vehicles and the Defects because knowledge thereof and the details related thereto were known and/or accessible only to Mazda; Mazda had superior knowledge and access to the facts; and knew the facts were

not known to, or reasonably discoverable, by Plaintiff and the Class. Mazda also had a duty to disclose because it made many false affirmative representations about the qualities of the Class Vehicles and their safety and reliability. Further, Mazda had a duty to either repurchase defective vehicles from its dealers or "immediately...give to the...dealer at the manufacturer's...own expense, the part or equipment needed to...correct the defect." 49 U.S.C. § 30116. Federal law expressly required Mazda to report the Defects to customers and dealers and remediate them immediately (which it has never done) or repurchase the defective vehicles from its dealers.

146. Virginia law also imposed a duty to disclose on Mazda to "clearly and unequivocally indicate in [its] advertisement[s] or offer[s] for sale [of the Class Vehicles] that the [Class Vehicles] are defective . . . or are 'seconds,' irregulars, imperfects, or 'not first class.'" Va. Code § 59.1-200(7).

147. Virginia law additionally imposed a duty to disclose on Mazda through multiple provisions of its criminal code.

148. Va. Code § 18.2-216(A):

> Any person, firm, corporation or association who, with intent to sell or in anywise dispose of merchandise, securities, service or anything offered by such person, firm, corporation or association, directly or indirectly, to the public for sale or distribution or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates or places before the public, or causes, directly or indirectly to be made, published, disseminated, circulated or placed before the public, in a newspaper or other publications, or in the form of a book, notice, handbill, poster, blueprint, map, bill, tag, label, circular, pamphlet or letter or in any other way, an advertisement of any sort regarding merchandise, securities, service, land, lot or anything so offered to the public, which advertisement contains any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading, or uses any other method, device or practice which is fraudulent, deceptive or misleading to induce the public to enter into any obligation, shall be guilty of a Class 1 misdemeanor.

*Id.*

149. Va. Code § 18.2-217(A): "Any person, firm, corporation or association who in any manner advertises or offers for sale to the public any merchandise, goods, commodity, service or thing with intent not to sell, or with intent not to sell at the price or upon the terms advertised or offered, shall be guilty of a Class 1 misdemeanor." *Id.*

150. Va. Code § 18.2-218:

> Any person, firm, corporation or association who in any manner knowingly advertises or offers for sale to the public any merchandise, goods, commodity or thing which is defective, blemished, secondhand or used, or which has been designated by the manufacturer thereof as "seconds," "irregulars," "imperfects," "not first class," or words of similar import without clearly and unequivocally indicating in the advertisement or offer of the merchandise, goods, commodity or thing or the articles, units or parts, thereof so advertised or offered for sale to the public is defective, blemished, secondhand or used or consists of "seconds," "irregulars," "imperfects" or "not first class," shall be guilty of a Class 1 misdemeanor.

151.

*Id.*

152. Mazda still has not made full and adequate disclosures and continues to defraud consumers by concealing and misrepresenting material information regarding the Defects and the performance and quality of Class Vehicles.

153. Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased the Class Vehicles. The actions of Plaintiff and Class Members were justified. Mazda was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Class Members.

154. Plaintiff and Class Members reasonably and justifiably relied on Mazda's representations and omissions regarding the safety, reliability, and quality of the Class Vehicles when deciding to purchase or lease their vehicles. Plaintiff and Class Members would not have

purchased or leased their vehicles, or would have paid less for them, had Mazda disclosed the true nature of the Defects.

155. Mazda intended that Plaintiff and Class Members rely on its misrepresentations and omissions in order to sell and lease more CX-90 vehicles and to avoid the costs associated with disclosing and remedying the Defects.

156. Plaintiff and Class Members relied upon Mazda's concealment and omissions regarding the quality of Class Vehicles and the Defects in deciding to purchase or lease Class Vehicles, including Mazda's failure to correct its uniform and false representations, through its website, multimedia advertisements, brochures, and in-person statements by its employees, agents, including authorized dealerships, sales representatives and/or repair technicians, touting the Class Vehicles quality, safety, and reliability.

157. Because of the concealment, omission, and/or suppression of the facts, Plaintiff and Class Members sustained damage because they did not receive the value of the price paid for their Class Vehicles. Plaintiff and Class Members would have paid less for Class Vehicles had they known about the Defects, or they would not have purchased or leased Class Vehicles at all.

158. Accordingly, Mazda is liable to Plaintiff and Class Members for actual damages in an amount to be proven at trial.

159. As a direct and proximate result of Mazda's fraudulent omissions and affirmative misrepresentations, Plaintiff and the Virginia Class suffered damages, including but not limited to overpayment for defective vehicles, diminished vehicle value, out-of-pocket expenses for repeated service visits and attempted repairs, and loss of use and enjoyment of their vehicles.

160. Mazda's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-

being, to enrich Mazda at the expense of Plaintiff and Class Members. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

161. Plaintiff and Class Members are also entitled to costs and reasonable attorney's fees.

**COUNT II:**
**VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT**
**VA. CODE §§ 59.1-196 *et seq.***
*On Behalf of Plaintiff and the Class*

162. Plaintiff incorporates all factual allegations set forth in this Complaint. Most specifically, they identify the same averments stated in the preceding Count I (Fraud).

163. Plaintiff brings this cause of action individually and on behalf of the Class.

164. Plaintiff is a "person," Mazda is a "supplier," and the Class Vehicles, including Plaintiff's Vehicle, are "goods" within the meaning of the VCPA. VA. CODE § 59.1-198.

165. The sale and offering for sale of Class Vehicles to Plaintiff and Class Members are "consumer transaction[s]" under the VCPA. *Id.* The warranty service and repairs of the Class Vehicles provided to Plaintiff and Class Members through Mazda's authorized dealers likewise constitute "consumer transaction[s]" and "services" under the VCPA.

166. Defendant's conduct, as described in this Complaint, occurred, directly and indirectly, in Virginia and constitutes prohibited practices in violation of Va. Code § 59.1-200.

167. Mazda violated Va. Code § 59.1-200, in its sale, advertisement, offering for sale, and warranty service and repairs of the Class Vehicles, on its own and by and through its authorized dealerships acting as Mazda's agents, including but not limited to the following:

a. Advertising and offering for sale the Class Vehicles without clearly and unequivocally indicating in the advertisement or offer for sale that the vehicles

were defective, blemished, deteriorated, or not first class, in violation of Va. Code § 59.1-200(A)(7);

b. Misrepresenting that the Class Vehicles and their components, including the braking system and Lane-keep Assist feature, would be free from defects and suitable for safe, ordinary use, in violation of Va. Code § 59.1-200(A)(5);

c. Failing to disclose material information regarding the Defects—namely, that Class Vehicles were prone to premature and excessive braking deterioration, loud brake squealing, and dangerous Lane-keep Assist overcorrection—despite Mazda's knowledge of these conditions, in violation of Va. Code § 59.1-200(A)(6);

d. Advertising and offering for sale the Class Vehicles with intent not to sell them as advertised or with intent not to sell upon the terms advertised, in violation of Va. Code § 59.1-200(A)(8);

e. Failing to provide repairs necessary to make the Class Vehicles functional and safe for regular use as represented to Plaintiff and Class Members, in violation of Va. Code § 59.1-200(A)(10);

f. Failing to adhere to and honor the terms of the warranty(ies) provided for the Class Vehicles, including by refusing to adequately repair or replace broken components and address the Lane-keep Defect, in violation of Va. Code § 59.1-200(A)(17); and

g. Engaging in other deception, fraud, false pretenses, false promises, and misrepresentations in connection with the sale, advertisement, and servicing of the Class Vehicles, in violation of Va. Code § 59.1-200(A)(14).

168. Mazda's conduct, as detailed in this Complaint, violated multiple subsections of Va. Code § 59.1-200, including but not limited to those identified above.

169. Mazda's violations of the VCPA were intentional and willful. Mazda knew or should have known of the Defects in the Class Vehicles yet failed to disclose this information to Plaintiff and Class Members, misrepresented the nature and cause of the Defects, and continued to market, sell, and service the Class Vehicles as safe and free from material defects.

170. In fact, Mazda knew of the Defects since before it released CX-90s in the United States, including Virginia, as detailed above. Mazda received confirmation of the existence of the Defects almost immediately after it sold Class Vehicles in the United States, including in Virginia. However, Mazda continued to allow unsuspecting new and used car purchases to buy or lease Class Vehicles and allowed them to continue driving dangerous vehicles.

171. Defendant owed Plaintiff and the Class Members a duty to disclose the true safety and reliability of the Class Vehicles because Defendant: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiff and the Class Members; (c) made incomplete representations about the safety and reliability of the foregoing generally, while withholding material facts from Plaintiff and the Class Members that contradicted these representations; and (d) owed a duty under the VCPA and Virginia law to disclose that the Class Vehicles were defective, seconds, irregulars, imperfects, or not first class.

172. Defendant intended that Plaintiff and other Class Members would, in the course of their decision to expend monies in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the quality of the Class Vehicles with respect to materials, workmanship, design and/or manufacture.

173. Mazda's failure to disclose and active concealment of the dangers and risks posed by the defective Class Vehicles were material to Plaintiff and the Class Members, and any reasonable consumer would have considered those facts important in deciding whether to purchase or lease a Class Vehicle. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

174. Mazda's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, caused Plaintiff and Class Members to be deceived about the safety and reliability of the Class Vehicles, and that such Class Vehicles would be backed by both express and implied warranties that would, in fact, be honored by Defendant.

175. Although Defendant and its agents were aware that the Class Vehicles were defective at the time that Plaintiff and the Class Members purchased or leased their Class Vehicles, Defendant refused to provide a fix for the Defects, free-of-charge in accord with the terms of its written warranty and to prevent the damages described herein.

176. Defendant's violations of the VCPA were intentional and willful because Defendant engaged in a calculated campaign to protect its bottom line from damage caused by mass marketing and sale of tens of thousands of defective vehicles. Defendant shifted the burden and costs of the Defects onto consumers like Plaintiff and Class Members instead of honoring their warranty obligation and purported commitment to safety.

177. In the alternative, even if Mazda's violations are deemed non-willful, Plaintiff and Class Members were nonetheless deprived of fair and ethical consumer transactions and suffered injury as a result.

178. Plaintiffs and the Class Members reasonably relied on Defendant's misrepresentations and omissions and expected that the Class Vehicles would not be equipped with defective braking and Lane-keep Assist systems, such that these Defects would render the Class Vehicles unsafe and not fit for their ordinary use. Further, Plaintiff and the Class Members reasonably expected Defendant would honor their warranty obligations, as represented to them at the time they purchased or leased their Class Vehicles.

179. The conduct of Defendant offends public policy, as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Plaintiff and Class Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

180. Plaintiff and the Class Members have been damaged as a proximate result of Defendant's violations of the VCPA and have suffered damages as a direct and proximate result of purchasing or leasing defective Class Vehicles.

181. As a direct and proximate result of Defendant's violations of the VCPA, as set forth above, Plaintiffs and Class have suffered ascertainable loss of monies and property, caused by Defendant's misrepresentations and failure to disclose material information and refusal to provide effective and free repairs pursuant to its warranties. Had they been aware of the Defects inherent in the Class Vehicles, Plaintiff and Class Members either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiff and Class Members did not receive the benefit of their bargain as a result of Defendant's misconduct.

182. Defendant's violations of the VCPA were intentional, willful, and designed to deprive Members of the consuming public, including Plaintiff and Class Members, of fair and ethical consumer transactions.

183. In the alternative, Defendant's violations of the VCPA were non-willful and deprived members of the consuming public, including Plaintiff and Class Members of fair and ethical consumer transactions.

184. Plaintiffs and Class Members are therefore entitled to relief, pursuant to Va. Code § 59.1-204(A), including actual and statutory damages, treble damages, and reasonable attorney's fees and costs. In the alternative, Plaintiff and Class Members are entitled to restitution and payment of reasonable attorney's fees and costs pursuant to Va. Code § 59.1-207.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the Virginia Class, hereby demands a trial by jury of all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant and award the following relief:

a. Certification of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3); appointment of Plaintiff as representative of the Class; and appointment of Plaintiff's counsel as Class Counsel;

b. An order declaring that Defendant's conduct, as described herein, violates the VCPA and constitutes fraud under Virginia law;

c. An award of actual, statutory, treble, and punitive damages to Plaintiff and the Class in an amount to be determined at trial, consistent with Va. Code § 59.1-204 and Virginia common law;

d. An award of punitive damages, as allowable by law, to Plaintiff and Class Members;

e. Restitution, disgorgement, and/or other equitable relief necessary to prevent Mazda from retaining the benefits of its unlawful conduct, including under Va. Code § 59.1-207 if appropriate;

f. An order requiring Mazda to notify all Class Members of the existence and nature of the Defects;

g. An award of reasonable attorney's fees and costs pursuant to Va. Code § 59.1-204(B) and as otherwise allowed by law, including Virginia's common law;

h. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

i. Such other and further relief as the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,

**JAMES R. BURNELL,**

By: *_/s/ Leonard A. Bennett_*

Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
Adam W. Short, VSB #98844
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com

Drew D. Sarrett, VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Telephone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

*Counsel for Plaintiff*